UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| FINANCE CALIFORNIA, INC., | : |
| | : |
| Plaintiff, | : |
| | : No. 3:07cv804 (MRK) |
| v. | : |
| | : |
| LAWYERS TITLE INSURANCE | : |
| CORPORATION and | : |
| LORRAINE HALICA, | : |
| | : |
| Defendants. | : |

## MEMORANDUM OF DECISION

On June 22, 2010, the Court issued a Ruling and Order [doc. # 166] denying Defendant Lawyers Title Insurance Corporation's ("LTIC's") and Defendant Lorraine Halica's Motion for Summary Judgment [doc. # 127], as well as motions for summary judgment by Third-Party Defendants Mark Singer; Cooley, Shrair PC; and David Shrair; and a motion for partial summary judgment by Plaintiff Finance California, Inc. ("FCI"). *See Finance California, Inc. v. Lawyers Title Ins. Corp.*, No. 3:07cv804 (MRK), 2010 WL 2982986 (D. Conn. June 22, 2010). However, the Court was unable to resolve questions that Defendants had raised regarding FCI's standing on the limited record before it. The Court held an evidentiary hearing on standing on October 20, 2010. In the Memorandum of Decision that follows, the Court addresses *only* the question of whether FCI has standing to sue Defendants, and not any additional issues that may arise at trial.

1

**I.**

The Court presumes that the parties are familiar with the facts and procedural history of this case, and does not recite them in detail here. Readers wishing to familiarize themselves with the background of this case are referred to the Court's decision denying the parties' motions for summary judgment. *See Finance California*, 2010 WL 2982986.

All of FCI's claims against LTIC and Ms. Halica are based on an escrow agreement ("Escrow Agreement") executed in August 2002, prior to the closing of the Delaney House loan. Besides the Escrow Agreement, the two documents most relevant to the questions Defendants have raised regarding FCI's standing are a bill of sale and assignment ("Bill of Sale") and an accompanying purchase agreement ("Purchase Agreement") executed by BizNiz, LLC ("BizNiz") and Reesa Niznik on April 9, 2007. In accordance with the latter two instruments, BizNiz assigned to Ms. Niznik certain rights arising out of documents executed in connection with the Delaney House loan transaction ("Loan Transaction"). Defendants argue that by this assignment ("Niznik Assignment"), BizNiz transferred to Ms. Niznik any claims that BizNiz may have had against LTIC and Ms. Halica, and by extension, also assigned away any claims against LTIC and Ms. Halica that FCI could have brought as BizNiz's servicing agent.

The Niznik Assignment occurred shortly after the conclusion of BizNiz's case before Judge Warren W. Eginton. *See Bizniz LLC v. Kratovil*, No. 05cv1431 (WWE) (D. Conn. filed Sept. 12, 2005). In the proceedings before Judge Eginton, LTIC and Ms. Halica challenged BizNiz's standing to sue them, and opposed BizNiz's efforts to substitute FCI for itself as the plaintiff in that action. *See* Defs.' Mem. in Support of Mot. to Dismiss [doc. # 14-2], *Bizniz LLC v. Kratovil*, No. 05cv1431 (WWE) (D. Conn. March 31, 2006); Defs.' Obj. to Mot. to Substitute Party [doc. # 23], *Bizniz LLC*

*v. Kratovil*, No. 05cv1431 (WWE) (D. Conn. June 21, 2006); Defs.' Obj. to Amended Compl. [doc. # 32], *Bizniz LLC v. Kratovil*, No. 05cv1431 (WWE) (D. Conn. Aug. 14, 2006). LTIC and Ms. Halica argued that BizNiz lacked standing because FCI had never assigned the promissory note ("Note") and mortgage ("Mortgage") for the Delaney House loan to BizNiz, and "BizNiz was not involved in the closing, or in the escrow arrangement, or otherwise in the mortgage transaction." *See* Defs.' Mem. in Support of Mot. to Dismiss [doc. # 14-2] at 5, *Bizniz LLC v. Kratovil*, No. 05cv1431 (WWE) (D. Conn. March 31, 2006).

Judge Eginton granted LTIC's and Ms. Halica's motion to dismiss for lack of standing on March 5, 2007. *See* Order [doc. # 45], *BizNiz, LLC v. Kratovil*, No. 05cv1431 (WWE) (D. Conn. Mar. 5, 2007). Judge Eginton's decision was premised on the fact that BizNiz had not produced proof of FCI's assignment of the Note and Mortgage to BizNiz; he found that there was no evidence that BizNiz had an interest in the Loan Transaction. *See id.* at 5-6. However, in his opinion, Judge Eginton stated that "it [was] undisputed that . . . the . . . transactions took place between [FCI] and . . . LTIC," and that "any alleged injury suffered due to [those] transactions would have befallen [FCI]." *See id.* at 3. Therefore, Judge Eginton found, FCI was "not prejudiced by [Judge Eginton's] decision and [was] free to file its own complaint." *Id.* at 4.

This lawsuit – containing virtually identical allegations to the suit heard by Judge Eginton, but fewer defendants – was filed in Connecticut Superior Court on April 25, 2007, and removed to this Court on May 21, 2007. *See* Notice of Removal [doc. # 1]. After denying the parties' motions for summary judgment on June 22, 2010, the Court scheduled an evidentiary hearing to aid it in the consideration of two issues related to standing that LTIC and Ms. Halica had raised in their Motion for Summary Judgment [doc. # 127]: (1) the scope of the April 9, 2007 assignment from BizNiz to

3

Reesa Niznick; and (2) whether FCI, in bringing this lawsuit, was acting as BizNiz's servicing agent for the Loan Transaction. *See Finance California*, 2010 WL 2982986, at *3.

## II.

FCI claims it has standing to bring this action because as the servicing agent for BizNiz in the Loan Transaction, it has retained authority to enforce BizNiz's legal rights under the contracts FCI entered into in its capacity as BizNiz's servicing agent. *See* Pl.'s Post-Hr'g Br. [doc. # 198] at 4-9. Defendants argue FCI lacks standing for two alternative reasons: (1) BizNiz transferred its rights under the Escrow Agreement to Reesa Niznik, meaning that Reesa Niznik is the real party in interest and the only party who would have standing to bring suit against LTIC and Ms. Halica; *see* Defs.' Post-Hr'g Mem. [doc. # 199] at 8; or (2) if Bizniz retained its rights under the Escrow Agreement, then only BizNiz, and not FCI, has standing to bring suit against LTIC and Ms. Halica. *See* Defs.' Resp. [doc. # 191] at 21. This argument is contrary to the position Defendants took before Judge Eginton. *See, e.g.*, Defs.' Obj. to Mot. to Substitute Party [doc. # 23] at 6, *Bizniz LLC v. Kratovil*, No. 05cv1431 (WWE) (D. Conn. June 21, 2006) ("The only remedy here is for Finance California . . . to file and proceed with a separate action."). Additionally, Defendants argue that even if FCI has standing, FCI cannot meet the amount-in-controversy requirement of 28 U.S.C. § 1332(a), and thus the Court does not have subject matter jurisdiction over the case. *See* Defs.' Post-Hr'g Mem. [doc. # 199] at 5-6.

For the reasons set forth below, the Court concludes that none of Defendants' arguments is convincing, and that FCI does have standing to sue LTIC and Ms. Halica in this action. The Court also concludes that it has subject matter jurisdiction over this action under 28 U.S.C. § 1332.

4

**A. Did BizNiz assign any right to sue LTIC and Ms. Halica to Ms. Niznik?**

In their pre-hearing briefs, Plaintiff and Defendants both focused on the question of whether BizNiz had assigned its rights to enforce the Note to Ms. Niznik. *See* Pl.'s Resp. [doc. # 189] at 6-14; Defs.' Resp. [doc. # 191] at 11. However, the duties that LTIC owed to BizNiz arose not under the Note – a document to which LTIC was not a party – but rather under the separate Escrow Agreement between FCI and LTIC. The question the Court must address is whether BizNiz assigned to Ms. Niznik in the Niznik Assignment rights under the Escrow Agreement.

When BizNiz assigned certain rights to Ms. Niznik on April 9, 2007, it did so using a Bill of Sale and accompanying Purchase Agreement. The Bill of Sale specifies that "[n]othing contained herein shall be construed to limit any of the representations or warranties of [BizNiz] contained in the Purchase Agreement or to otherwise modify any provision of the Purchase Agreement." *See* Bill of Sale, Ex. A to Defs.' Resp. [doc. # 191-1] at 3. Additionally, it specifies that "[a]ll capitalized terms not defined in this Bill of Sale shall have the meanings given to them in the Purchase Agreement." *Id.* at 2. Defendants now argue that the Bill of Sale and Purchase Agreement transferred to Ms. Niznik not only all rights under the Note, but also any rights arising under the Escrow Agreement. *See* Defs.' Post-Hr'g Mem. [doc. # 199] at 9. Defendants' arguments are unconvincing.

In arguing that BizNiz assigned away its rights under the Escrow Agreement, Defendants focus on a few select sentences from the Bill of Sale and Purchase Agreement. First, Defendants note that the Bill of Sale states that BizNiz assigns BizNiz's "entire right, title, and interest under, in and to the Judgment, the Judgment Lien, and the Loan Documents." *See* Defs.' Post-Hr'g Mem. [doc. # 199] at 9; Bill of Sale, Ex. A to Defs.' Resp. [doc. # 191-1] at 2. Second, Defendants point

to Recital H of the Purchase Agreement, which states that "[t]he Judgment, the Judgment Lien, and all other documents executed in connection with the loans are hereinafter collectively referred to as the Loan Documents." *See* Purchase Agreement, Ex. B to Defs.' Resp. [doc. # 191-1] at 7. According to Defendants, these sentences are conclusive evidence that BizNiz transferred its rights under the Escrow Agreement to Ms. Niznik via the Bill of Sale because "[t]he Escrow Agreement is clearly a document that was 'executed in connection with'" the Delaney House loan, and in fact "was a *sine qua non* of the Delaney House loan." *See* Defs.' Post-Hr'g Mem. [doc. # 199] at 9. It is hard to understand why the Escrow Agreement between FCI and LTIC would be the "*sine qua non* of the Delaney House loan." Even beyond that unsupported assertion, though, Defendants' confident conclusion about the content and scope of the Niznik Assigment ignores basic principles of contract interpretation.

The Bill of Sale provides that it "shall be construed and enforced in accordance with the laws of the State of California." Bill of Sale, Ex. A to Defs.' Resp. [doc. # 191-1] at 3. Under California law, "[a] contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." Cal. Civ. Code § 1636. "When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible." *Id.* § 1639. Most importantly here, "[t]he whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." *Id.* § 1641; *see Sy First Family Ltd. P'ship v. Cheung*, 70 Cal. App. 4th 1334, 1342 (1999). Because the whole of a contract is to be considered together, the meaning of the sentences quoted by Defendants can only be determined through analysis of the Bill of Sale and Purchase Agreement in their entirety.

6

When the contract is analyzed as a whole, it is apparent that the intention of the parties to the Bill of Sale was to convey one particular bundle of rights: BizNiz's rights against the Ansons, two of the guarantors of the Delaney House loan, against whom a judgment had been entered. Focusing on references to a broad category of "Loan Documents," Defendants ignore the fact that the Bill of Sale consistently refers to the "Judgment, Judgment Lien, and Loan Documents" rather than simply to the "Loan Documents." *See* Bill of Sale, Ex. A to Defs.' Resp. [doc. # 191-1] at 2. Indeed, the Purchase Agreement uses the phrase "Loan Documents" to refer *to* the "Judgment" and "Judgment Lien." *See* Purchase Agreement, Ex. B. to Defs.' Resp. [doc. # 191-1] at 7 ("The Judgment, the Judgment Lien, and all other documents executed in connection with the loans are hereinafter referred to as the Loan Documents."). Recital E of the Purchase Agreement defines the "Judgment" as the judgment entered "[o]n June 24, 2005, [by] the Los Angeles Superior Court . . . in favor of BizNiz . . . against Ronald I. Anson, individually and as trustee of the [Anson] Trust, and against the [Anson] Trust." Purchase Agreement, Ex. B to Defs.' Resp. [doc. # 191-1] at 6. According to the Bill of Sale, the conveyance of the "Judgment, Judgment Lien, and Loan Documents" is meant to be comprehensive insofar as it "includes without limitation, [BizNiz's] entire rights, title and interest under, in and to the Judgment, which was recorded by [BizNiz] with the San Diego County Recorder's Office on July 21, 2005, and constitutes a judgment lien against real property commonly known as 1455 Luneta Drive, Del Mar, California, 92014 (the "Property")." *See* Bill of Sale, Ex. A to Defs.' Resp. [doc. # 191-1] at 2.

That precise description of the Judgment and Judgment Lien is repeated in Recital F on the first page of the Purchase Agreement. *See* Purchase Agreement, Ex. B to Defs.' Resp. [doc. # 191-1] at 6. Indeed, a reading of all nine of the "Recitals," which precede the "Terms and Conditions" of

7

the Purchase Agreement, confirms that the parties were focused on the judgment against the Ansons. Recital A states that "[BizNiz] is the holder of a judicial award for the payment of money secured by an involuntary judgment lien affecting the property rights of Ronald I. Anson and Suzanne Anson ("Debtors")." *See id.* Recitals B through D describe the circumstances under which BizNiz filed a complaint against the Ansons and other guarantors. *See id.* Recitals E through G address the judgment entered against the Ansons, and the judgment lien on the residence at 1455 Luneta Drive, Del Mar, California. *See id.* at 6-7. Recital H defines the phrase "Loan Documents," and Recital I simply states that "[Ms. Niznik] desires to purchase the Loan Documents upon the terms and conditions contained herein." *See id.* at 7.

While the individual sentences quoted by the Defendants seem to refer to a broad set of documents, "[p]articular clauses of a contract are subordinate to its general intent." Cal. Code Civ. P. § 1860. There is little question that the general intent of the Bill of Sale and Purchase Agreement was to allow Ms. Niznik to pursue collection from two particular guarantors of the Delaney House loan – the Ansons. Accepting for the sake of argument Defendants' contention that the most obvious implication of the phrases "Loan Documents" and "all documents executed in the connection with the loans" would be an intent to transfer all rights associated with any document executed in connection with the Delaney House loan, the Court must try to reconcile that broad language with the apparently repugnant language of the Purchase Agreement, which explicitly limits the scope of BizNiz's assignment of rights related to the Loan Transaction. *See* Cal. Civ. Code § 1652 ("Repugnancy in a contract must be reconciled, if possible, by such interpretation as will give some effect to the repugnant clauses, subordinate to the general intent and purpose of the whole contract.").

At the outset, the Court notes that while it has accepted certain contentions for the sake of argument, in fact, the Court is not convinced that a stranger to the contract would assume that "Loan Documents" included the Escrow Agreement, even if the phrase "Loan Documents" were read in isolation from the rest of the contract. "The terms of a writing are presumed to have been used in their primary and general acceptation, but evidence is nevertheless admissible that they have a local, technical, or otherwise peculiar signification, and were so used and understood in the particular instance, in which case the agreement must be construed accordingly." Cal Code Civ. P. § 1861. At the evidentiary hearing, Attorney Katherine Windler testified that among California real estate lawyers, it is common practice to distinguish among loan, escrow, title, credit, and underwriting documents. Indeed, the Table of Contents for the Delaney House loan closing binder – which was not prepared by Ms. Windler's law firm – includes separate headings for "Loan Documents" and "Title/Escrow." *See* Ex. C to Defs.' Resp. [doc. # 191-1] at 17-18. Ms. Windler was the only witness to testify about the meaning of the term "loan documents" among California attorneys, and her testimony was not contradicted.

Beyond that initial reflection, when provisions of a contract appear to be in tension, the Court must allow the more specifically worded provision to guide its interpretation of the parties' agreement. *See* Cal. Code. Civ. P. § 1859. The first of the Terms and Conditions of the Purchase Agreement instructs:

> . . . [BizNiz] agrees to sell the Loan Documents, and all rights of [BizNiz], its successors and assigns under the Loan Documents, on the terms and conditions hereinafter set forth. Specifically excluded from the sale and retained by the [BizNiz] are (i) all rights that [BizNiz] may have against Guarantors other than Ronald I. Anson, Suzanne G. Anson and the Trust, (ii) all right, title and interest that [BizNiz] may have in real property owned by Jack Garrett, and (iii) all right title and

> interest that [BizNiz] may have in bankruptcy cases of any of the Guarantors, excepting only the bankruptcy of Ronald I. Anson.

*See* Purchase Agreement, Ex. B to Defs.' Resp. [doc. # 191-1] at 7, ¶ 1. There is no indication that this term of the Purchase Agreement creates a narrow exception to an otherwise comprehensive assignment of BizNiz's rights against individuals and entities it transacted with in connection with the Delaney House loan, rather than describing the narrowness of the contract as a whole. For example, the term is not introduced by the phrase "notwithstanding any other provision set forth herein." *See Boghos v. Certain Underwriters at Lloyd's of London*, 36 Cal. 4th 495, 504 (2005) (declining to apply Cal. Code Civ. P. § 1859 and allow a more specific contractual provision to govern the Court's interpretation of a more general one because the more specific clause was prefaced by the sentence "[n]otwithstanding any other item set forth herein"). Whatever "Loan Documents" and "all documents executed in connection with the loans" might include, the Purchase Agreement makes clear that the purpose of conveying those documents was to assign BizNiz's rights against the Ansons alone – not rights against LTIC and Ms. Halica.

Moreover, while the judgment lien named in the Bill of Sale and Purchase Agreement applied to a single property owned by the Ansons, the judgment lien was created to help recover the debts arising out of *three* loans for which the Ansons were guarantors. *See* Purchase Agreement, Ex. B to Defs.' Resp. [doc. # 191-1] at 6. In other words, if there is a unifying theme for the unspecified documents and rights assigned to Ms. Niznik via the Bill of Sale, it must be the judgment against the Ansons – and not the Delaney House loan transaction or the Escrow Agreement.

Unsurprisingly, given this purpose, the Bill of Sale and Purchase Agreement contain no references to the Escrow Agreement. As defense counsel acknowledged during the evidentiary

hearing, the Escrow Agreement had nothing to do with the judgment against the Ansons. Indeed, the Escrow Agreement would give Ms. Niznik no rights against any of the Guarantors, including the Ansons. Given that the conveyance to Ms. Niznik did not even include all the rights arising under the Note, and indeed explicitly excluded rights closely related to BizNiz's judgment and judgment lien against the Ansons, there is no basis to conclude that the Bill of Sale nonetheless conveyed to Ms. Niznik, *sub silentio*, a set of rights unrelated to the judgment against the Ansons and arising under the Escrow Agreement. *See* Cal. Civ. Code §1648 ("However broad may be the terms of a contract, it extends only to those things which it appears that the parties intended to contract."); *Hess v. Ford Motor Co.*, 27 Cal. 4th 516, 524 (2002); *Victoria v. Super. Ct.*, 40 Cal. 3d 734, 739 (1985).

Finally, Defendants have also argued in their post-hearing brief that the Escrow Agreement must have been transferred to Ms. Niznik because "it is indisputable that the Escrow Agreement was part of the Delaney House 'Seller's loan file.'" *See* Defs.' Post-Hr'g Mem. [doc. # 199] at 9. Here, the Court presumes that the Defendants are relying – as they did at the evidentiary hearing – on the statement in the Purchase Agreement that "[t]he documents listed on Exhibit "C" shall be included in the definition of Loan Documents." *See* Purchase Agreement, Ex. B to Defs.' Resp. [doc. # 191-1] at 7. Exhibit C contains a list of sixteen items, the last of which is "such other documents as may be included in the Seller's loan file." *See id.* at 10. As Defendants themselves have noted, Exhibit C is "riddled with blanks," *see* Defs.' Resp. [doc. # 191] at 5, and the Court is not at all confident that an apparently never-completed exhibit to a contract is reliable evidence of the contracting parties' intent. However, even if the Court assumes that it must have been the parties' intention to convey "such other documents as may be included in Seller's loan file," the Court is not persuaded that these "other documents" include the Escrow Agreement. At the evidentiary hearing, Defendants' only

11

basis for concluding that the "Seller's loan file" must include the Escrow Agreement was that the Table of Contents to the closing binder for the Delaney House loan lists, among others, a document called "Escrow Agreement."  *See* Ex. C to Defs.' Resp. [doc. # 191-1] at 18.

Leaving aside the Defendants' insistence that "a document's meaning is governed by 'its four corners,'" *see* Defs.' Post-Hr'g Mem. [doc. # 199] at 11, the evidence from the Delaney House loan closing binder does not help Defendants.  First, no witness at the evidentiary hearing testified that the "Seller's loan file" included the contents of the Delaney House loan closing binder.  Second, unlike the terms "Judgment" and "Judgment "Lien," the phrase "Seller's loan file" in Exhibit C is not capitalized and is nowhere specifically defined.  Third, the term "loan file" is not used anywhere in either the Purchase Agreement or Bill of Sale, save the last sentence in Exhibit C.  There is nothing to indicate that the phrase "Seller's loan file" was meant to refer to the closing binder for the Delaney House loan, let alone that the cautious phrasing "such other documents as may be included " was used to convey to Ms. Niznik *every* document that could possibly be included in a "Seller's loan file" – including the Escrow Agreement.

In sum, there is no credible evidence that BizNiz transferred rights under the Escrow Agreement to Ms. Niznik in the Niznik Assignment.

**B. In suing LTIC, is FCI acting as a servicing agent for BizNiz?**

FCI does not claim that it is bringing this action directly on its own account, but rather that it has sued LTIC and Ms. Halica in its capacity as BizNiz's servicing agent for the Loan Transaction, including the Escrow Agreement.  *See, e.g.*, Pl.'s Post-Hr'g Br. [doc. # 198] at 4-9.

Rule 17 of the *Federal Rules of Civil Procedure* states that "[a]n action must be prosecuted in the name of the real party in interest."  *See* Fed. R. Civ. P. 17(a)(1).  Rule 17 identifies seven types

of parties who may sue in their own names, without joinder of the person for whose benefit the action is sought, including "a party . . . in whose name a contract has been made for another's benefit." *See id.* 17(a)(1)(f). However, that list is not exclusive. Although "the question of in whose name a suit must be brought is procedural," and thus governed by federal law, "that question must be answered with reference to state law." *Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber*, 407 F.3d 34, 48 (2d Cir. 2005) (emphasis omitted).

Under both Connecticut and California law,[1] servicing agents have the capacity to institute lawsuits on behalf of their principals. *See Secured Equities Corp. v. Westmark Communities, Inc.*, No. G035520, 2006 WL 880179, at *7-*8 (Cal. App. 4th Dist. Apr. 6, 2006); *Master Fin., Inc. v. Christensen Assocs.*, No. CV065004255S, 2008 WL 1052387, at *2-*3 (Conn. Super. Ct. Mar. 20,

---

[1] The parties have not asked the Court to apply a particular state's law to decide questions about the existence and scope of the agency relationship between FCI and BizNiz. FCI is a California corporation with its principal place of business in California. *See* Notice of Removal [doc. # 1] at 2. LTIC is a Nebraska corporation with a principal place of business in Virginia, and Ms. Halica is a citizen of South Carolina. *See id.* At the time the Escrow Agreement was executed, Ms. Halica was based in Fairfield, Connecticut. *See* Second August Escrow Letter, Ex. A to Pl.'s Local R. 56(a)2 Statement [doc. # 146-1] at 2. Neither FCI nor BizNiz has been able to produce a written, signed servicing agreement for the Delaney House loan, though at the evidentiary hearing, Gerald Weiner testified that FCI always entered into a standard written servicing agreement with BizNiz for each of the loans FCI serviced, including the Delaney House loan. After the evidentiary hearing, FCI produced an unsigned copy of the standard form agreement referenced by Mr. Weiner in his testimony, and that form agreement states that it shall be governed by and construed in accordance with California law. The Escrow Agreement does not contain a choice-of-law clause. FCI has referenced both Connecticut law and California law in its briefing on the issue of FCI's status as a servicing agent and the question of a servicing agent's capacity to bring suit on behalf of its principal, *see, e.g.*, Pl.'s Mem. in Opp'n to Defs.' Mot. for Summary Judgment [doc. # 145] at 26 (applying Connecticut law); Pl.'s Post-Hr'g Br. [doc. # 198] at 4-6 (applying California law). Although LTIC has argued that FCI cannot prove that a servicing relationship exists between FCI and BizNiz, LTIC's briefs cite no case law in support of that argument. *See* Defs.' Reply [doc. # 153] at 3-4; Defs.' Resp. [doc. # 191] at 21-24.

13

2008). Thus, as BizNiz's servicing agent on the Loan Transaction, FCI would be a real party in interest under Rule 17 of the *Federal Rules of Civil Procedure* and have standing to bring this action. *See, e.g.*, *Greer v. O'Dell*, 305 F.3d 1297, 1299 (11th Cir. 2002) (holding that "a loan servicer is a 'real party in interest' with standing to conduct, through licensed counsel, the legal affairs of the investor relating to the debt that it services"); *In re Conde-Dedonato*, 391 B.R. 247, 250 (Bankr. E.D.N.Y. 2008); *In re Viencek*, 273 B.R. 354, 358 (Bankr. N.D.N.Y. 2002).[2]

Indeed, in their briefs in support of their motion for summary judgment, Defendants acknowledged that if FCI had completed the Loan Transaction as BizNiz's servicing agent, and had continued to act as BizNiz's servicing agent up through the commencement of this litigation, FCI, as agent, would have standing to sue on behalf of its principal, BizNiz. *See, e.g.*, Defs.' Reply [doc. # 153] at 3-4 (acknowledging that FCI would have standing if a servicing relationship between FCI and BizNiz had existed, but arguing that there was no credible evidence that FCI serviced the Delaney House loan). This admission by Defendants is telling, and it contradicts Defendants' recent suggestion that BizNiz itself would not have any rights under the Escrow Agreement, and that FCI only would have standing to sue on its own behalf, unless the Escrow Agreement was formally "assigned" to BizNiz. *See* Defs.' Post-Hr'g Mem. [doc. # 199] at 5-7. Moreover, Defendants' recent suggestion that FCI only can have direct standing – and not standing as BizNiz's agent – is in conflict

---

[2] In contrast, if FCI were acting as BizNiz's agent merely for the purpose of bringing suit, and not as an extension of its role as servicing agent for the Loan Transaction, FCI might not have standing to bring suit in its own name. *See, e.g.*, *In re Hwang*, 396 B.R. 757, 767 (Bankr. C.D. Cal 2008) ("As a general rule, a person who is an attorney-in-fact or an agent solely for the purpose of bringing suit is viewed as a nominal rather than a real party in interest and will be required to litigate in the name of his principal rather than in his own name." (citation and quotation marks omitted)); *Second Exeter Corp. v. Epstein*, 5 Conn. App. 427, 228 (1985) (holding that the mere fact that the plaintiff has fiduciary duty to another is insufficient, by itself, to give the plaintiff standing to sue in his own name).

with Defendants' earlier argument that "[i]t is undisputed that Plaintiff has no direct standing." Defs.'Reply [doc. # 153] at 3. It is also in conflict with Defendants' argument that FCI does not have standing because *BizNiz*'s rights under the Escrow Agreement were transferred to Reesa Niznik. *See* Defs.' Post-Hr'g Mem. [doc. # 199] at 4. Regardless, Defendants' contention that FCI could not bring this action as BizNiz's servicing agent unless FCI formally assigned the Escrow Agreement to BizNiz flatly ignores basic agency principles: "the contract of an agent is in law the contract of the principal." *Robert Lawrence Associates, Inc. v. Del Vecchio*, 178 Conn. 1, 13 (Conn. 1979).

It is undisputed that in concluding the Loan Transaction, FCI was acting as a servicing agent for BizNiz.[3] Nonetheless, at the evidentiary hearing, defense counsel argued that the principal-agent relationship between BizNiz and FCI must have ended when Mr. Gerald Weiner of FCI fell ill, and Dr. Niznik took on tasks that FCI had previously performed.

There is no legal or factual basis for Defendants' contention that the principal-agent relationship between BizNiz and FCI terminated when Dr. Niznik, rather than FCI, handled the Delaney House loan business during the period when Mr. Weiner was ill. When both the agent and principal are corporate entities, the agent's actual authority terminates only (1) when the agent or principal ceases to exist as an entity or commences a process that will lead to cessation of its existence, or when the entity's powers are suspended as governed by the legal regime by virtue of which the entity has legal personality; (2) by agreement between the parties; or (3) upon a

---

[3] In their pre-hearing brief, Defendants argued that because "the Buyer immediately defaulted on the Delaney House loan, there in fact was never anything for [FCI] to 'service' with regard to the loan," and that there was a "complete lack of any evidence showing a servicing relationship between [FCI] and BizNiz." *See* Defs.' Resp. [doc. # 191] at 21-22. At the evidentiary hearing on standing, though, Defense counsel conceded that FCI served as BizNiz's servicing agent for the Delaney House loan, at least through March or April 2003, and received at least one payment on the Note for BizNiz.

15

manifestation of revocation by the principal to the agent, or a manifestation of renunciation by the agent to the principal. *See* Rest. 3d Agency, § 3.06, .07, .09, .10 (2006); *see also* Rest. 2d Agency, Scope Note (1957) ( "[T]he authority or apparent authority terminates by notification of one of the parties to the other, by the death or legal disability of one of them, or by the destruction of the subject matter."); Cal Civ. Code §§ 2355-2356 (listing circumstances in which "[a]n agency is terminated").

Because neither BizNiz nor FCI ceased to exist, and neither BizNiz's nor FCI's powers were legally suspended, the only way FCI's actual authority could have terminated is based on an agreement between BizNiz and FCI, or upon a manifestation of revocation by BizNiz to FCI or a manifestation of renunciation by FCI to BizNiz. Yet, according to the uncontroverted testimony of Dr. Niznik and Mr. Weiner, neither BizNiz nor FCI ever terminated their principal-agent relationship. Because BizNiz and FCI never terminated their principal-agent relationship, and because FCI has brought suit on a contract it entered into in its capacity as BizNiz's servicing agent, FCI has standing to pursue the claims against LTIC and Ms. Halica in its own name.[4]

### III.

Although the Court limited the evidentiary hearing to the issue of standing, Defendants argue in their post-hearing brief that whether or not FCI has standing as a servicing agent for BizNiz, the Court must dismiss this action for lack of subject matter jurisdiction because it is clear "to a legal

---

[4] The unsigned form servicing agreement that FCI produced following the evidentiary hearing, *see supra* note 1, gives FCI broad authority to take action on behalf of its principal in the case of default by a borrower. However, the Court does not rely on the content of that unsigned form servicing agreement for its conclusion that FCI has instituted this suit in its capacity as BizNiz's servicing agent for the Delaney House loan. *See, e.g.*, *Gateway Co. v. DiNoia*, 232 Conn. 223, 240 (1995) ("The existence and extent of an agency relationship may be established by circumstantial evidence based upon an examination of the situation of the parties, their acts and other relevant information.").

certainty" that FCI cannot meet the amount-in-controversy requirement of 28 U.S.C. § 1332. *See* Defs.' Post-Hr'g Mem. [doc. # 199] at 5. Under 28 U.S.C. § 1332, "[t]he district courts . . . have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $ 75,000, exclusive of interest and costs," and there is diversity of citizenship between the parties. *See* 28 U.S.C. § 1332(a). Defendants are correct that the Court must dismiss a plaintiff's claims for want of jurisdiction under § 1332 when it is "apparent that, 'to a legal certainty,' [the plaintiff] could not recover the requisite jurisdictional amount." *See Tongkook Am. v. Shipton Sportswear Co.*, 14, F.3d 781, 785 (2d Cir. 1994). However, "[i]f the right of recovery is uncertain, the doubt should be resolved in favor of the subjective good faith of the plaintiff." *Id.* (citation and alteration omitted). The jurisdictional amount includes any type of damages that would be recoverable as a matter of right under the applicable state law. *See Deutsch v. Hewes Street Realty Corp.*, 359 F.2d 96, 100 (2d Cir. 1966).

FCI's Complaint was originally filed in Connecticut Superior Court, and it was Defendants who chose to remove the action to this Court. *See* Notice of Removal [doc. # 1] at 1. When they petitioned for removal to federal district court, Defendants represented as follows:

> The action brought against the defendants . . . is a civil action, of which this Court has original jurisdiction under the provisions of 28 U.S.C. § 1332, and is one which may be removed to this court by defendants pursuant to the provisions of 28[] U.S.C. § 1441, in that it is a civil action wherein, on information and belief based on plaintiff's assertions in the Complaint, *the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs* . . . .

*Id.* at 2 (emphasis added). Now, however, Defendants argue that "[i]n assigning the "Loan Documents,' including the Note, [to Ms. Niznik,] BizNiz retained <u>no</u> monetary interest in the Delaney House loan transaction and thus subject matter jurisdiction pursuant to 28 U.S.C. § 1332

cannot exist" because "BizNiz merely suffered nominal damages." *See* Defs.' Post-Hr'g Mem. [doc. # 199] at 9.[5]

For the reasons discussed above, the Court is not persuaded that BizNiz actually did assign to Ms. Niznik all its rights under the Note. Yet even if the Court assumes that Defendants are correct that BizNiz transferred its rights under the Note to Ms. Niznik, Defendants' argument that there would be no damages left for BizNiz to recover under the Escrow Agreement is frivolous. A number of parties are potentially liable for the significant losses BizNiz suffered as a result of the Loan Transaction. The fact that Ms. Niznik was assigned the right to seek damages from the Ansons – who were liable to BizNiz under the Note – does not mean that BizNiz, or its servicing agent FCI, has given up the right to seek damages from other potential defendants, including LTIC and Ms. Halica.

Defendants surely would be owed a credit for any amount of the Delaney House loan debt that was paid as a result of the judgment against the Anson. But Defendants cannot avoid liability on the basis of the assignment to Ms. Niznik. Furthermore, should FCI prevail against LTIC and Ms. Halica on its four claims, Defendants would be liable not simply for the money due on the Delaney House loan, but also for consequential damages. *See, e.g.*, *Ambrogio v. Beaver Road Associates*,

---

[5] Defendants also argue that if FCI is bringing this suit in its own right, rather than as BizNiz's servicing agent, FCI cannot meet the jurisdictional amount-in-controversy requirement because FCI assigned the Note and Mortgage to BizNiz and thus suffered at most nominal damages from the Defendants' alleged breach of contract, intentional breach of contract, breach of fiduciary duties, and breach of good faith and fair dealing. *See* Defs.' Post-Hr'g Mem. [doc. # 199] at 6. Since the Court has determined that FCI has standing in its capacity as BizNiz's servicing agent, Defendants' argument that FCI could not meet the amount-in-controversy requirement "bring[ing] this Action in its own right" is moot. For the same reason, the Court need not address Defendants' claim that "[if] Plaintiff brings this Action in its own right, Plaintiff cannot . . . rely on the accidental failure of suit statute, *Conn. Gen. Stat.* § 52-592." *See* Defs.' Post-Hr'g Mem. [doc. # 199] at 7.

267 Conn. 148, 155 (2003) (observing that damages available for breach of contract include "any loss that may fairly and reasonably be considered as arising . . . from the usual course of things, from [the] breach of contract itself" (citation, quotation marks, and alteration omitted)); *Wilcox v. Schmidt*, 2010 Conn. Super. LEXIS 1407, *8-*9 (June 3, 2010) (noting that a plaintiff who prevails on a breach of fiduciary duty claim is entitled to damages proximately caused by the defendant's breach of fiduciary duty); *see also* Cal. Civ. Code § 3300 ("For the breach of an obligation arising from contract, the measure of damages . . . is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom."); Cal. Civ. Code § 3333 ("For the breach of an obligation not arising from contract, the measure of damages . . . is the amount which will compensate for all the detriment proximately caused thereby, whether it could have been anticipated or not."). BizNiz has spent a considerable amount of money pursuing the guarantors of the Delaney House loan. In sum, the Court has no doubt that the amount of damages FCI could recover against LTIC and Ms. Halica is considerably north of $75,000. Therefore, the Court has subject matter jurisdiction over this dispute.

**IV.**

For the foregoing reasons, the Court finds that FCI has standing as BizNiz's servicing agent to prosecute this action, and that the Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.

/s/      Mark R. Kravitz
United States District Judge

**Dated at New Haven, Connecticut: November 22, 2010**